[No. 14553-1-III.   Division Three.   April 29, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. STUART MORGAN, *Appellant*.

*Hugh M. Spall, Jr.,* for appellant.
*Stuart Morgan,* pro se.
*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Lauri M. Boyd, Deputy,* for respondent.

KURTZ, J. — Stuart Morgan appeals his conviction of first degree manslaughter contending: (1) the court erred in denying his motion to dismiss the manslaughter charge, (2) the evidence was not sufficient to convict him of manslaughter, and (3) the court erred in imposing an exceptional sentence. Pro se Mr. Morgan also contends: (1) the prosecutor concealed material evidence, (2) the court erred in not dismissing the manslaughter charge because it was a general statute rather than a specific statute, and (3) his counsel's assistance was ineffective. We affirm Mr. Morgan's first degree manslaughter conviction and exceptional sentence.

## FACTS

On April 1, 1994, at 8:31 P.M., Stuart Morgan called 911 and reported "my wife passed out on the floor and she won't get up." The 911 operator told Mr. Morgan how to start CPR. Paramedics and police officers arrived several minutes later and found Beth Morgan unconscious on the floor. Police Sergeant Mel Light noticed Mr. Morgan's hair was dripping wet and when asked why his hair was wet,

Mr. Morgan answered he was sweating from doing CPR. Mr. Morgan denied drugs were used, explaining his wife just fell over. Mr. Morgan appeared unusually calm, although he stated he had done CPR for 20 minutes before calling 911. Sergeant Light investigated further and observed the bathtub and shower walls were wet.

The paramedics found Ms. Morgan on the floor. Her lips were bluish, her skin ashy, her eyes glazed, and her pupils fixed and dilated, all indicating she had been without oxygen for more than five minutes. She had no heartbeat and was not breathing. Eventually, they got Ms. Morgan's heart beating again. She was taken by ambulance to the hospital. At the hospital, it was determined Ms. Morgan had suffered cardiac arrest due to an overdose of cocaine. Mr. Morgan reluctantly agreed to withdraw his wife's life support on the condition he would be the only person in the room with her when she died. On April 4, Ms. Morgan was removed from life support and died.

The Yakima County Prosecuting Attorney's Office filed an information charging Mr. Morgan with first degree manslaughter on July 19. The information was amended October 3, to add the alternative charge of controlled substance homicide. Mr. Morgan's motion to dismiss the manslaughter charge was denied.

At the trial, Dr. Harold McCartney testified he performed an autopsy on Ms. Morgan on April 5. He found bruising in the left forearm consistent by date and coloring with punctures associated with the birth of her child a month earlier. He also found three puncture marks on the right forearm. He found nothing indicating the victim was a chronic drug user. In fact, Ms. Morgan had given birth one month earlier and there was no medical evidence of cocaine use at that time.

Dr. William Brady testified he performed a second autopsy on April 8. He observed bruises on Ms. Morgan's upper right arm, which were not observable at the first autopsy because the blood was drained, that he believed were caused by finger marks and recent needle marks. He

reviewed the laboratory analysis and stated Ms. Morgan ingested cocaine in an "easily fatal amount that would have produced death very rapidly," and a small amount of alcohol. Dr. Brady opined it was physically impossible for Ms. Morgan to have grabbed her right arm, found a vein and injected herself.

Chase McCubbins testified he knew Mr. Morgan from drug treatment during the winter of 1993. While in jail together, Mr. McCubbins said Mr. Morgan told him "he shot her up" with a "good hit." Mr. McCubbins also testified that after Ms. Morgan began having her second seizure, Mr. Morgan told him he just went and took a shower to try to relax. When he came back and "[saw] that she was dead," Mr. Morgan hid the drugs and then called 911.

The trial produced mixed evidence concerning Ms. Morgan's use of drugs. A chemical analysis of her hair, showed the presence of cocaine consistent with chronic or repetitive cocaine use, but could not determine the time frame for when the cocaine was ingested.

Family members testified Ms. Morgan was right handed and afraid of needles. They also testified that Mr. Morgan refused the family's request to see Ms. Morgan before she was taken off of life support, refused to permit Ms. Morgan's children to see her before she was taken off of life support, denied their request for a funeral and refused to authorize publication of an obituary notifying Ms. Morgan's hearing impaired friends of her death.

Mr. Morgan elected to testify. He said Ms. Morgan began injecting cocaine the day after she came home from the hospital after childbirth. He claimed she had track marks on her hand and the back of her ankle. He stated that on April 1, Ms. Morgan had cocaine delivered to their home by a man named PeeWee. Mr. Morgan said Ms. Morgan shot herself up six or seven times that evening. Although he had no CPR training, he claimed he was giving artificial respiration when the paramedics arrived. He admitted lying to the paramedics about not seeing Ms.

Morgan use cocaine that night because he was scared of getting busted for cocaine again. Mr. Morgan also admitted he did not call 911 until after Ms. Morgan's second seizure because he was trying to stop her from biting her tongue during the first seizure. He denied taking a shower before police arrived. Mr. Morgan admitted he left the hospital while Ms. Morgan's condition was uncertain to return home and dispose of the needles.

The jury found Mr. Morgan guilty of first degree manslaughter and left the verdict form blank as to controlled substances homicide. The State sought an exceptional sentence. A hearing was held December 7 and 8, 1994. Mr. Morgan's standard range was 36 to 48 months. He was sentenced to 84 months based on an egregious lack of remorse.

## ANALYSIS

*1. Did the court err in denying Mr. Morgan's motion to dismiss the manslaughter charge?*

Mr. Morgan contends that because RCW 9A.32.010 lists the types of homicide in the disjunctive, and because the category of felony murder captures all deaths occurring as the result of one person performing a felony upon another, the crime of manslaughter cannot be based on the commission of a felony. *State v. Sill*, 47 Wn.2d 647, 289 P.2d 720 (1955); *State v. Dennison*, 115 Wn.2d 609, 801 P.2d 193 (1990); *State v. Davis*, 121 Wn.2d 1, 846 P.2d 527 (1993). The crime of controlled substances homicide requires delivery of a controlled substance (a felony) and a death caused by the felony. RCW 69.50.415. Every time a person commits the crime of controlled substances homicide, he necessarily commits the crime of felony murder. Therefore, Mr. Morgan maintains the statutes are concurrent and a person who distributes cocaine and causes death must be charged with the more specific statute, with controlled substances homicide. However, the jury did not find Mr. Morgan guilty of the controlled substances homicide.

Rather, they found him guilty of manslaughter. Consequently, Mr. Morgan argues we should reverse this case.

A person is guilty of manslaughter in the first degree when he recklessly causes the death of another person. RCW 9A.32.060. Mr. Morgan argues that the charge of manslaughter cannot be based on a felony because the crime would thus be felony murder. He cites *Sill* as holding that the crime of manslaughter cannot be based on the commission of a felony. However, he misinterprets *Sill*. The court in *Sill* only stated that the "killing of a person" must be unlawful, but not a felonious act for a charge of manslaughter. It did not say the act which amounted to the "recklessness" in a manslaughter charge could not be felonious.

The underlying felony on which felony murder is based functions only as a substitute for the mental state necessary to prove the crime. *State v. Hartz*, 65 Wn. App. 351, 354, 828 P.2d 618 (1992). In the same way, the element of recklessness provides the mental element for the crime of manslaughter. *State v. Bowerman*, 115 Wn.2d 794, 806, 802 P.2d 116 (1990). Here, Mr. Morgan was charged with manslaughter for recklessly failing to provide prompt medical treatment for his wife.

The prosecution needed to show that Mr. Morgan's behavior surrounding his wife's death was reckless. Recklessness is defined by RCW 9A.08.010(1)(c): "A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation."

In *State v. Norman*, 61 Wn. App. 16, 26, 808 P.2d 1159, *review denied*, 117 Wn.2d 1018 (1991), the jury found that Mr. Norman's failure to summon medical assistance for his son amounted to recklessness and he was convicted of first degree manslaughter. Washington has long recognized the parental duty to provide medical care for minor children. In *State v. Williams*, 4 Wn. App. 908, 915, 484 P.2d

1167 (1971), the court described this duty as a "natural duty existing independently of statutes" and went on to state: "We therefore hold that the violation of the parental duty to furnish medical care to a minor dependent child, the other elements of manslaughter being present, is a sufficient basis on which to rest a conviction of the crime of manslaughter . . . ."

There are no cases in Washington recognizing the duty of a husband or wife to summon medical aid for a spouse. This duty has been recognized in several jurisdictions including Montana. *State v. Mally*, 139 Mont. 599, 366 P.2d 868 (1961); *Territory v. Manton*, 8 Mont. 95, 19 P. 387 (1888). However, Washington does have a statute which recognizes this duty. It states:

> (1) Any person who is able to provide support, or has the ability to earn the means to provide support, and who:
>
> (a) Wilfully omits to provide necessary food, clothing, shelter, or medical attendance to a child dependent upon him or her; or
>
> (b) *Wilfully omits to provide necessary* food, clothing, shelter, or *medical attendance to his or her spouse*, is guilty of the crime of family nonsupport.
>
> (2) The crime of family nonsupport is a gross misdemeanor under chapter 9A.20 RCW.

RCW 26.20.035 (emphasis added). The violation of this statutory duty could provide the recklessness necessary for a manslaughter charge.

In addition, California has found that a duty to summon medical aid exists if a person creates or increases the risk of injury to another. *People v. Oliver*, 210 Cal. App. 3d 138, 258 Cal. Rptr. 138, 143 (1989). In *Oliver,* the court upheld a manslaughter conviction for a defendant who took her extremely intoxicated ex-husband home, helped him use heroin, dragged him behind her house after finding him unconscious and allowed him to die without medical assistance. The court found the defendant's behavior created

an unreasonable risk of harm and a duty to prevent that risk from occurring by summoning aid. Her failure to summon any medical assistance breached that duty and made her responsible for his death. *Id.* at 144. Under the ruling in *Oliver,* it would not matter that the Morgans were involved in the commission of a felony as Mr. Morgan alleges because his duty to summon medical help would exist due to his helping place her in the position of needing aid.

Here, Mr. Morgan had a statutory duty to provide medical care, a natural duty to provide medical help to his wife, and a duty to summon aid for someone he helped place in danger. His violation of this duty amounted to recklessness and was sufficient basis for the manslaughter charge. The court's denial of the motion to dismiss was proper.

Mr. Morgan's first degree manslaughter conviction and his exceptional sentence are affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MUNSON, J. Pro Tem., concurs.

SCHULTHEIS, A.C.J. (concurring) — I concur in the judgment affirming Stuart E. Morgan's conviction for first degree manslaughter because I agree he breached a duty of care to his wife, and that this breach caused her death. I write separately, however, because I disagree that the basis for this duty may be found in the family nonsupport statute, RCW 26.20.035.

The family nonsupport statute was enacted in 1984 as one of many sections adopted to address the "urgent need for vigorous enforcement of child support obligations . . . ." LAWS OF 1984, ch. 260, § 1, at 1408. While RCW

26.20.035 and its precursor, former RCW 26.20.030,[1] have served as the basis for the duty to provide medical care to children, the breach of which supported a verdict of manslaughter,[2] they have never served as anything but support statutes for spouses.[3] I do not believe the Legislature intended this statute to impose a generalized duty to seek medical attention for a spouse.

Although at common law one person is not under a legal compulsion to aid another, most states recognize a parent's or a guardian's duty to provide medical care to his or her children or dependents. *See In re Welfare of Hudson*, 13 Wn.2d 673, 693, 126 P.2d 765 (1942); *State v. Williams*, 4 Wn. App. 908, 915, 484 P.2d 1167 (1971); *Commonwealth v. Konz*, 498 Pa. 639, 450 A.2d 638, 641 (1982). In Washington, this duty is codified in such statutes as RCW 9A.42.030(1), which makes it a crime to recklessly withhold medical care from a child or dependent person over whom the defendant has physical custody. *State v. Bartlett*, 74 Wn. App. 580, 589, 875 P.2d 651 (1994), *aff'd*, 128 Wn.2d 323, 907 P.2d 1196 (1995).

Ordinarily, a spouse is a competent person with the capacity to understand his or her medical condition and to seek or reject medical attention. Under certain circumstances, however, a spouse may become incapacitated and so helpless as to assume the condition of a newborn. *State v. Mally*, 139 Mont. 599, 609, 366 P.2d 868 (1961). In those cases where the spouse is unconscious or otherwise helpless to summon or reject medical aid, the other spouse takes on the cloak of custodian, and has a duty to provide medical treatment. *See Konz*, 450 A.2d at 642; *People v.*

---

[1]Former RCW 26.20.030 once prohibited willful omission, without lawful excuse, of necessary food, clothing, shelter or medical assistance to a child, stepchild, ward or spouse. It was amended by LAWS OF 1984, ch. 260, § 26, at 1420.

[2]*State v. Parmenter*, 74 Wn.2d 343, 344, 444 P.2d 680 (1968); *State v. Williams*, 4 Wn. App. 908, 912, 484 P.2d 1167 (1971).

[3]*See, e.g., State v. Clark*, 88 Wn.2d 533, 540, 563 P.2d 1253 (1977); *State v. Arndt*, 87 Wn.2d 374, 380, 553 P.2d 1328 (1976).

*Robbins*, 83 A.D.2d 271, 274, 443 N.Y.S.2d 1016 (1981) and cases cited therein.

Here, the evidence shows that Mr. Morgan's wife was unconscious at the time he observed her first seizure and yet he only called for medical aid 10 or 15 minutes later. Further, he impeded medical treatment after the paramedics arrived when he neglected to tell them she had used cocaine. His actions and omissions sufficiently exhibit a breach of his duty to provide medical assistance to his helpless wife, and the breach constitutes a reckless deviation from reasonable conduct. *See State v. Dunbar*, 117 Wn.2d 587, 594, 817 P.2d 1360 (1991); *Williams*, 4 Wn. App. at 912.

On this basis and joining in the majority opinion on the other issues, I concur.

Review denied at 133 Wn.2d 1011 (1997).